### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **MARK MINTO,** | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION NO.** |
| **v.** | : | **3:14-CV-00747 (VLB)** |
| | : | |
| **CONNECTICUT STATE POLICE,** | : | **September 30, 2015** |
| **MAJOR SARAH BRUSO,** | : | |
| **SERGEANT CLAUDIA TINO-** | : | |
| **TOMASSETTI,** | : | |
| **SERGEANT MICHAEL P.** | : | |
| **KOSTRZEWA, AND** | : | |
| **TROOPER MATTHEW HERZ,** | : | |
| **Defendants.** | : | |

## MEMORANDUM OF DECISION GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS [Dkt. #14]

Plaintiff, Mark Minto ("Minto"), brings federal constitutional claims under 42 U.S.C. § 1983, *et seq*. and a state law claim of intentional infliction of emotional distress against Defendant Connecticut State Police ("CSP") and Defendants Major Sarah Bruso ("Bruso"), Sergeant Claudia Tino-Tomassetti ("Tomassetti"), Sergeant Michael P. Kostrzewa ("Kostrzewa"), and Connecticut State Trooper, Matthew Herz ("Herz") (collectively the "Individual Defendants") stemming from Minto's arrest and the seizure of his weapon, weapon permit, and special police powers, following an altercation with Jennifer Gruszczak ("Gruszczak"). Currently before the Court is Defendants' Motion to Dismiss. For the reasons that follow, Defendants' motion is GRANTED in part and DENIED in part.

## I.   Factual Background

Unless otherwise noted, the following allegations are taken from Plaintiff's Complaint and are deemed to be true for the purposes of this

Motion.[1]

On May 29, 2012, at approximately 4:05 P.M., Minto was driving home from work on Route 9 in Middletown, Connecticut.  *See* [Dkt. #1, Compl. at ¶ 10].  At the time, Minto was employed as a Police Officer in the Department of Mental Health and Addiction Services ("DMHAS") at

---

[1] In addition to the Complaint, Defendants attached several documents to their motion to dismiss, including an incident report prepared by Defendant Herz.  *See* [Dkt. #14-1, Defs.' Memo. of Law in Supp. of Mot. to Dismiss, at 30-40].  Defendants correctly assert that the Court may properly consider, in addition to the allegations contained in the four corners of the Complaint, documents attached to, incorporated by reference within, and those which are integral to the Complaint.  *See* [*id.* at 4 (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002); *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993))].  In order for documents to be incorporated by reference, the complaint must make a "clear, definite and substantial reference to the documents." *Helprin v. Harcourt, Inc.*, 277 F. Supp. 2d 327, 330-31 (S.D.N.Y. 2003).  Documents are "integral" to a complaint when "'the complaint relies heavily upon [the documents'] terms and effect,' and the 'plaintiff has actual notice of all the information in the [documents] and relied upon those documents in framing the complaint.'"  *Anwar v. Fairfield Greenwich Ltd.*, 831 F. Supp. 2d 787, 791 (S.D.N.Y. 2011) (quoting *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2005)).  Here, Minto relies on the substance of Herz's report, which he paraphrases, in support of his Fourth Amendment unlawful seizure claim.  *See* [Dkt. #1, Compl. at ¶¶ 42-43].  Specifically, Minto alleges that Defendant "Herz had no legal reason to seize the Plaintiff's firearm," and then relies on the facts asserted in the report to demonstrate a lack of legal basis.  [*Id.*].  Minto's repeated references to the report, coupled with his actual reliance on its substance to assert a lack of probable cause for both his arrest and the seizure of his weapon render the document incorporated by reference.  *See* [Dkt. #1, Compl. at ¶¶ 25-26, 34, 37-38, 42-43, 61]; *see Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (holding documents that the "complaint explicitly refers to and relies upon . . . to show that [plaintiff] was deprived of liberty without adequate notice of the charges against him" were "incorporated by reference into the complaint").  However, the Court does not consider, for purposes of this motion, the other documents attached to Defendants' submission, including the consent-to-search form, the gun registration documentation, and Minto's and Gruszczak's handwritten (and generally illegible) statements.  *See* [Dkt. #14-1, Defs.' Memo. of Law in Supp. of Mot. to Dismiss, at 35-40].  As to these documents, the Complaint offers, at most, passing references without discussing or relying upon their substance.  *See* [Dkt. #1, Compl. at ¶¶ 40, 42].

Connecticut Valley Hospital ("CVH") in Middletown and was wearing his Department-issued uniform and badge.  [*Id.*].  During his drive home, Minto found himself behind a silver Nissan Altima, driven by another motorist, Gruszczak, who began to drive erratically.  [*Id.*].  Minto also observed a young child in the rear passenger seat of Gruszczak's car.  [*Id.* at ¶ 11]. While directly in front of Minto, Gruszczak repeatedly applied her vehicle's brakes, commonly referred to as "brake-checking."  [*Id.*].  This caused Minto to take evasive braking maneuvers to avoid crashing into Gruszczak's car.  [*Id.*].  Minto also attempted to pass Gruszczak's car on the right, but she increased and decreased its speed to prevent Minto from passing.  [*Id.* at ¶¶ 11-12].  Apparently displeased with Minto's attempts to pass her vehicle, Gruszczak displayed her middle finger to Minto through the open sunroof of her car.  [*Id.* at ¶ 12].

Concerned with Gruszczak's dangerous driving, Minto decided to notify police.  [*Id.*].  He proceeded to follow Gruszczak's car and twice attempted to call 911, but the calls did not go through.  [*Id.* at ¶ 13].  On the third attempt, while still following Gruszczak, Minto reached a 911 operator. [*Id.*].  Minto continued to follow Gruszczak into a residential condominium complex, where Gruszczak lived, and reported his location to the 911 operator.  [*Id.* at ¶¶ 13-14].  Minto parked his car in an area close to the complex and got out of the car in order to provide the 911 operator with Gruszczak's license plate number.  [*Id.* at ¶¶ 14-15].  At that point, Gruszczak approached Minto and asked him why he was following her so

closely, but Minto appears to have ignored her question and continued his conversation with the 911 operator.  [*Id.* at ¶¶ 15-16].

The 911 operator instructed Minto to return to his car, and Minto complied.  [Dkt. #1, Compl. at ¶ 17].  Gruszczak also departed the condominium complex and separately contacted the Cromwell Police Department.  [*Id.*].  A short time later, Gruszczak returned to the complex, along with two Cromwell police officers.  [*Id.* at ¶ 18].  Shortly thereafter, two Connecticut State troopers arrived at the complex, one of whom was Defendant Herz.  [*Id.* at ¶ 19].  Upon reaching the scene, Herz noted that Minto and Gruszczak "were separated and everything was calm."  [Dkt. #14-1, Defs.' Memo. of Law in Supp. of Mot. to Dismiss, at 32].  Herz also observed that Minto was wearing "a uniform that had Police patches on the right and left upper arm and a silver metal badge."  [*Id.*].

Herz then approached Minto and asked Minto to identify his employer and provide Herz with his direct supervisor's contact information. [*Id.*].  Herz called Minto's direct supervisor, Sgt. John Rumley ("Rumley"), and requested that Rumley come to the scene.  [*Id.*; Dkt. #1, Compl. at ¶ 19].  Herz stated in his report that the reason he requested Rumley to appear at the scene was so he "could explain what had transpired."  [Dkt. #14-1, Defs.' Memo. of Law in Supp. of Mot. to Dismiss, at 32].

Next, Herz took a statement from Defendant Gruszczak.  Gruszczak told Herz that Minto was driving behind her, and his car was "following her so close[ly] that she could not see its headlights."  [*Id.*].  Minto then pulled up next to her in the right lane and was yelling at her.  [*Id.*].  Minto then

**4**

pulled behind her again and Gruszczak put her arm out of the sunroof of her car and waved at him to back off.  [*Id.*].  Minto continued to follow her to her home and was on his cell phone the entire time.  [*Id.*].  Gruszczak then told police that when she parked her car, Minto got out of his vehicle and yelled, "I'm going to arrest you for reckless endangerment and tapping your brakes on the highway."  [*Id.*].  However, Gruszczak stated that Minto never identified himself as a Police Officer, nor did she "readily identify him as a Police Officer."  [*Id.*].  On the other hand, according to Gruszczak, Minto did have his CVH police uniform and a gun belt on when he confronted her.  [*Id.*].  Gruszczak next ordered Minto off her property, but Minto stated he was going to call the Cromwell Police Department.  [*Id.*].  Accordingly, Gruszczak drove away from her home and called the police herself.  [*Id.*].

After hearing Gruszczak's account, Herz then spoke with Minto, who provided Herz with his version of the events, consistent with the allegations in his Complaint.  *Compare* [*id.* at 33] *with* [Dkt. #1, Compl. at ¶¶ 10-18].  Minto also informed Herz that he told Gruszczak that "she could be arrested for risk of injury to a minor for the way she was driving."  [Dkt. #14-1, Defs.' Memo. of Law in Supp. of Mot. to Dismiss, at 33].  Minto does not challenge the accuracy of Herz's report.[2]

---

[2] He instead alleges that the statements in the report do not support a finding of probable cause for his arrest and that Gruszczak's account of the events, which the report recorded, was inaccurate.  *See* [Dkt. #1 Compl. at ¶¶ 25-26, 34, 37-38, 42-43, 59-61].

Herz then asked Minto if he had any firearms in his possession.  [Dkt. #1, Compl. at ¶ 22].  Minto responded that he "did not have a gun on his belt at the time of the incident because CVH Police are not allowed to carry guns at work."  [Dkt. #14-1, Defs.' Memo. of Law in Supp. of Mot. to Dismiss, at 33].  After this statement, Minto signed a form consenting to the search of his vehicle.  *See* [*id*; Dkt. #1 Compl. at ¶ 40].[3]

Herz proceeded to search Minto's car, and in the "rear compartment area of his mini[-]van," Herz found a pistol, which he seized.  [Dkt. #14-1, Defs.' Memo. of Law in Supp. of Mot. to Dismiss, at 33; Dkt. #1, Compl. at ¶ 22].  Herz stated in his report that Minto held a valid Connecticut pistol permit, that the firearm was properly registered to him, and that he seized the weapon "for safety reasons."  [*Id.*; Dkt. #1, Compl. at ¶ 42].  The report does not contain any statements as to what those reasons were, or provide any other explanation for the seizure.  [Dkt. #1, Compl. at ¶¶ 42-43].

When Minto's supervisor, Rumley, arrived on the scene, Herz "explained to him what had transpired."   [Dkt. #14-1, Defs.' Memo. of Law in Supp. of Mot. to Dismiss, at 33].  In response, Rumley stated that CVH did not permit personal firearms on its property, nor were they permitted to be in vehicles or on an officer at any time.  [Dkt. #14-1, Defs.' Memo. of Law in Supp. of Mot. to Dismiss, at 33].  Neither the Complaint nor the incident report indicates that Minto was aware, prior to Rumley's statement, that

---

[3] Defendants contend that Minto voluntarily signed the consent-to-search form.  However, Minto alleges that he signed it under "threat and duress," and was thus "coerced" into signing it.  [Dkt. #1 Compl. at ¶ 40].

CVH policies prohibited him from possessing a firearm anywhere on CVH property.

Minto was arrested at the scene, and was issued a misdemeanor summons for driving violations, breach of the peace, and criminal impersonation of a police officer. [Dkt. #1, Compl. at ¶ 20]. No charges were brought against Gruszczak, nor was she subject to any other type of enforcement action as a result of the incident. [*Id.* at ¶ 21; Dkt. #14-1, Defs.' Memo. of Law in Supp. of Mot. to Dismiss, at 33]. In addition, Defendant Tomassetti received an instruction from the Connecticut State's Attorney's Office to submit an arrest warrant application to a court for approval by a judge prior to arresting Minto. [*Id.* at ¶ 24]. Nevertheless, Defendants did not obtain an arrest warrant. [*Id.*]

The next day, May 30, 2012, Minto was informed that, as a result of his arrest, the Connecticut State Police were revoking his pistol permit and special police powers. [*Id.* at ¶ 27]. Shortly thereafter, Minto surrendered his pistol and police identification card to the Special Licensing and Firearms Unit of Defendant CSP, as ordered. [*Id.*].

By letter to Minto, dated May 30, 2012, Defendant Bruso immediately revoked Minto's police identification card and the special police powers they conferred. [Dkt. #1, Compl. at ¶¶ 27, 64-65]. The reason given for the revocation was Minto's "involvement in an incident investigated by Troop[er] H[erz]." [*Id.* at ¶ 65]. However, Defendant Herz did not complete his report of the incident until May 31, 2012, the day *after* Bruso sent the letter. *See* [Dkt. #14-1, Defs.' Memo. of Law in Supp. of Mot. to Dismiss, at

31-33 (bearing a "Report Date" of "5/31/2012")].[4]  Minto further alleges that he was not "provide[d] a due process hearing" prior to the revocation of these powers.  [*Id.* at ¶ 28].

On July 30, 2012, Minto's attorney wrote Bruso a letter informing her that Minto was unable to perform his job without his police identification card and asked her to state the "basis for the revocation" and "the procedure for appealing this decision."  [*Id.* at ¶ 68].  On August 16, 2012, Bruso responded by letter, stating that "neither statute nor regulation provides for an appeals process" to redress the revocation of a police identification card.  [*Id.* at ¶ 69].  As a result, Minto contends that, "[a]t no time" has he received any explanation of how the revocation decision was reached or on what authority it was based.  [*Id.* at ¶ 70].  Nor has he had any opportunity to appeal the decision.  [*Id.* at ¶ 71].  Minto contends that his employer, CVH, put him on unpaid leave, where he has remained since that time, because he lost his special police powers.  [*Id.* at ¶ 28].  On May 9, 2013, Minto successfully appealed the revocation before the Board of Firearms Permit Examiners, which reinstated Minto's permit to carry a concealed weapon.  [*Id.*].  On May 23, 2014, Minto filed his seven-count Complaint seeking monetary damages.  *See* [Dkt. #1, Compl. at 20].[5]

---

[4] **Defendant Kostrzewa approved Herz's report without question.  [Dkt. #1 Compl. at ¶ 26].**

[5] **In addition to monetary relief, the Complaint also requests "[s]uch other relief in law or equity as the Court may deem appropriate."  [Dkt. #1, Compl. at 20].  This passage does not constitute a request for injunctive relief.  *See White v. Martin*, 26 F. Supp. 2d 385, 387, 387 n. 4 (D. Conn. 1998) (finding that a complaint "seeks no prospective, injunctive relief"**

## II.   Legal Standard

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  *Sarmiento v. U.S.*, 678 F.3d 147 (2d Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  While Rule 8 does not require detailed factual allegations, "[a] pleading that offers 'labels and conclusions' or 'formulaic recitation of the elements of a cause of action will not do.'  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 678 (citations and internal quotations omitted).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'"  *Id.* (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557 (2007)).  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  *Id.* (internal citations omitted).

In considering a motion to dismiss for failure to state a claim, the Court should follow a "two-pronged approach" to evaluate the sufficiency of the complaint.  *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010).  "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 679).  "At the second step, a court should determine whether the 'well-pleaded factual allegations,' assumed to be

where plaintiff pleads "only monetary relief and 'such other relief in law or equity as the Court may deem appropriate'").

true, 'plausibly give rise to an entitlement to relief.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 679).  "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678 (internal quotations omitted).  In general, the Court's review on a motion to dismiss pursuant to Rule 12(b)(6) "is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated by reference."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).

III.   Analysis

A.     Count I is Barred by the Doctrines of Qualified and Sovereign Immunity

Count I of the Complaint asserts a Section 1983 claim predicated upon the Plaintiff's false arrest in violation of the Fourth Amendment.  *See* [Dkt. #1 Compl. at 7-10].[6]  "To establish a claim of false arrest under 42 U.S.C. § 1983, a plaintiff must show that the defendant intentionally confined him without his consent and without justification."  *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (citation and quotation omitted).  Because probable cause to arrest constitutes justification, there can be no claim for false arrest where the arresting officer had probable cause to arrest the plaintiff.  *Id.* (citation and quotation omitted).  Probable cause to arrest exists when the arresting officer has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to

_____

[6] Each of Minto's constitutional claims are brought pursuant to 42 U.S.C. § 1983.  *See* [Dkt. #1 at 7-18].

warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.  *Id.* (citation and quotation omitted).

Comparatively, if probable cause to arrest is ultimately found not to have existed, an arresting officer will still be entitled to qualified immunity from a suit for damages, if he can establish that there was "arguable probable cause" to arrest.  *Id.*  Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed or (b) officers of reasonable competence could disagree on whether the probable cause test was met.  *Id.* (citation and quotation omitted).  Thus, the analytically distinct test for qualified immunity is more favorable to the officers than the one for probable cause; "arguable probable cause" will suffice to confer qualified immunity for the arrest.  *Id.* In assessing whether an officer's conduct was objectively unreasonable, courts "look to the information possessed by the officer at the time of the arrest" but "do not consider subjective intent, motives, or beliefs of the officer."  *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2014) (citation and quotation omitted).  In addition, "[o]nce a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence."  *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (citation and quotations omitted).  Thus, when a police officer is presented with conflicting accounts, he "does not have to prove plaintiff's version wrong before arresting him."  *Curley*, 268 F.3d at 70.

The allegations in the Complaint and the statements in the incident report are sufficient to establish, at minimum, arguable probable cause for Minto's arrest, such that the Individual Defendants are entitled to qualified immunity.  For instance, the statements by both Minto and Gruszczak are sufficient to support probable cause for his arrest for breaching the peace.

"A person is guilty of creating a public disturbance when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he (1) engages in fighting or in violent, tumultuous, or threatening behavior; or (2) annoys or interferes with another person by offensive conduct; or (3) makes unreasonable noise."  Conn. Gen. Stat. § 53a-181(a).

In his Complaint, Minto acknowledges following Gruszczak's vehicle, which was traveling at high speed, all the way to her "residential condominium complex," exiting his vehicle while wearing his police "uniform and badge," and walking up to her car, where at least some words were exchanged between the two.  [Dkt. #1, Compl. at ¶¶ 10-11, 13-15]. Minto also does not contest the accuracy of Herz's report, insofar as it states that Minto told Gruszczak "she could be arrested for risk of injury to a minor for the way she was driving."  [Dkt. #14-1, Defs.' Memo. of Law in Supp. of Mot. to Dismiss, at 33].  In addition, Gruszczak told Herz that (i) when he was following her, Minto's car was "so close that she could not see its headlights"; (ii) Minto yelled at her while they were driving; (iii) when they arrived at her house, Minto got out of his vehicle and yelled, "I'm going to arrest you for reckless endangerment and tapping your brakes on the highway"; and (iv) Minto did not leave when she ordered him off her

property, compelling her to leave her own home and call for police assistance.  [*Id.* at 32].

Taken together, the facts Herz gathered from Minto and Gruszczak establish that Minto created a public disturbance by intentionally annoying or alarming Gruszczak, or recklessly creating a risk that he would annoy or alarm her.   His unbridled pursuit and confrontation of Gruszczak and threatening behavior, in fact, annoyed and offended her, to the extent that he not only caused her to call the police for protection, but also forced Gruszczak to leave her home to do, thereby depriving her of the sanctity and quiet enjoyment of her home.   Collectively, the facts Minto and Gruszczak related to Herz establish probable cause to believe that Minto breached the peace and created a public disturbance.

Minto's challenge of the criminal impersonation charge is also unsuccessful for two reasons.  First, Minto selectively quotes a portion of the relevant statute and implies that, "because he was a sworn police officer . . . with the [CVH]," held police certifications, had been granted certain special police powers, and was dressed in his department-issued uniform, there was no probable cause for his arrest.  *See* [Dkt. #21, Pl.'s Opp. at 7-8]; *see also* Conn. Gen. Stat. § 53a-130(a)(4) ("A person is guilty of criminal impersonation when such person . . . (4) pretends to be a public servant . . . or wears or displays without authority any uniform, badge or shield by which such public servant is lawfully distinguished . . . ."). However, this is just one of four grounds upon which one may be found guilty of criminal impersonation.  The facts discussed above would provide

probable cause for the Defendants to find that, by following Gruszczak all the way to her home while wearing a uniform and badge, and speaking to her about her possible arrest based on the manner in which she operated her vehicle, Minto "pretend[ed] to be a state marshal with intent to . . . induce [Gruszczak] to submit to such pretended official authority or otherwise to act in reliance upon that pretense."  Conn. Gen. Stat. § 53a-130(a)(2).  Second, that Minto presented Defendant Herz, a police officer, with his identification, such that *Herz* would not have confused him for a state marshal, is irrelevant to the question at issue, namely, whether Minto impersonated a police officer in his interactions with Gruszczak.  [Dkt. #21, Pl.'s Opp. at 8].

Moreover, Minto's own allegations regarding his driving, including his "attempt[] to pass [Gruszczak's] vehicle on the right" and taking "evasive braking maneuvers," coupled with Gruszczak's statements regarding his close following of her vehicle, would support the driving offenses with which Minto was charged.  [Dkt. #1 Compl. at ¶ 11; Dkt. #14-1, Defs.' Memo. of Law in Supp. of Mot. to Dismiss, at 32].  Minto responds principally by pointing to Gruszczak's alleged conduct.  *See* [Dkt. #21, Pl.'s Opp. at 9-10].  That Gruszczak may also have behaved poorly, or even illegally, is not relevant to the question of whether or not probable cause has been shown as to the charges brought against Minto.

Finally, Minto's claim against Defendant CSP must be dismissed because "Connecticut has not waived its sovereign immunity with respect to claims brought under section 1983 . . . for monetary damages."  *Turner*

**14**

*v. Boyle*, No. 3:13-cv-616 (SRU), 2015 WL 4393005, at *6 (D. Conn. Jul. 15, 2015); *see also Zipoli v. Connecticut Dep't of Public Safety*, No. 3:99-cv-58 (AHN), 1999 WL 608833, at *2 (D. Conn. Jul. 29, 1999) (dismissing § 1983 claims against Connecticut State Police "[b]ecause the Connecticut State Police is a department of the state of Connecticut" and therefore "is not considered a 'person' within the meaning of § 1983").[7]

Accordingly, Count I of the Complaint is DISMISSED.

**B.    Count II States a Fourth Amendment Claim Based on the Search and Seizure of Minto's Firearm**

Minto asserts a claim under the Fourth Amendment alleging that Defendants unlawfully searched his vehicle, by coercing him into signing a waiver consenting to the search, and then seized his weapon for no lawful reason.  *See* [Dkt. #1 Compl. at ¶¶ 41-46].  In response, Defendants assert two defenses: (i) Minto consented to the search and (ii) the seizure of his weapon was incident to his arrest.  At this stage, neither defense succeeds.

Warrantless searches and seizures are *per se* unreasonable unless they fall within a recognized exception.  *See Moore v. Andreno*, 505 F.3d 203, 208 (2d Cir. 2007) ("[T]he Supreme Court has [] admonished that a warrantless search is '*per se* unreasonable . . . . subject only to a few specifically established and well-delineated exceptions.");  *U.S. v. Place*,

---

[7] **For the same reason, all claims against the Individual Defendants in their official capacities are DISMISSED.  In his Opposition, Minto contends that sovereign immunity does not bar his claims against the Individual Defendants in their official capacity because 42 U.S.C. § 1983 applies to "[e]very person," including state officials.  [Dkt. #21, Pl.'s Opp. at 12, 17].  Minto is mistaken.  *See Meija v. Blanchette*, 36 F. App'x 466, 467 (2d Cir. 2002) ("[S]tate officials sued in their official capacities have Eleventh Amendment immunity from suit, and hence are not considered 'persons' within the meaning of § 1983.") (citations omitted).**

462 U.S. 696, 701 (1983) ("In the ordinary case, the [Supreme] Court has viewed a seizure of personal property as *per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized.").  "One of the specifically established exceptions to the warrant requirement is a search that is conducted pursuant to consent." *Levy v. Kick*, No. 3:06-cv-390 (PCD), 2007 WL 2492036, at *7 (D. Conn. Aug. 30, 2007) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). Consent to a search is valid if it is "freely and voluntarily given." *Schneckloth*, 412 U.S. at 222.  Whether consent was obtained voluntarily "or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Id.*

    To support their consent argument, Defendants rely entirely upon Minto's signature on a consent-to-search form.  *See* [Dkt. #14-1, Defs.' Memo. of Law in Supp. of Mot. to Dismiss, at 9-10].  However, Minto contends that Defendant Herz "coerced" him into signing the form "under threat and duress."  [Dkt. #1, Compl. at ¶ 41].  While the Court is inclined to agree with the Defendants that, absent additional facts, this bare assertion, standing alone, would be legally insufficient to withstand the Defendants' motion, *see* [Dkt. #14-1, Defs.' Memo. of Law in Supp. of Mot. to Dismiss, at 10], this conclusion must be considered in light of the factual allegations set forth in the earlier portions of the Complaint.  *See* [*id.* at ¶ 40 (incorporating by reference "[p]aragraphs 1 through 38")].

The Complaint alleges that, while waiting in his car for police aid to arrive, Minto was approached by a set of local police officers, who were accompanied by the complainant, Gruszczak.  [*Id.* at ¶¶ 17-19].  When Herz and the other CSP officer arrived, they summoned Minto's direct supervisor, Rumley, to appear on the scene.  [*Id.* at ¶ 19].  Herz stated in his report that the reason he requested Rumley to appear at the scene was so he "could explain what had transpired."  [Dkt. #14-1, Defs.' Memo. of Law in Supp. of Mot. to Dismiss, at 32].  Herz then took Gruszczak's statement, before taking Minto's.  [*Id.*].  After giving his statement, and despite his account of the events, Herz refused to charge Gruszczak.  [Dkt. #1, Compl. at ¶ 21].  Finally, just before he signed the consent form, Minto told Herz that he "did not have a gun on his belt at the time of the incident because CVH Police are not allowed to carry guns at work."  [Dkt. #14-1, Defs.' Memo. of Law in Supp. of Mot. to Dismiss, at 33].  Given the number of officers who came to the scene, that some arrived with the complainant, that Defendant Herz immediately (and for no stated reason) summoned Minto's employer to the scene for the purpose of conveying to the employer his version of the events, and that Minto stated he was not permitted to carry a weapon at work but may not have been aware that this prohibition extended beyond his person until Rumley informed Herz of this fact, the Court concludes that Minto has pleaded sufficient facts to call into question whether he voluntarily signed the consent-to-search form.

As for the seizure of Minto's gun, Defendants assert that it "was seized incident to arrest."  [Dkt. #14-1, Defs.' Memo. of Law in Supp. of Mot.

to Dismiss, at 10].  While "police officers may seize items incident to a lawful arrest which pose an immediate threat to their safety or constitute evidence in danger of being destroyed . . . they may not embark upon a general search of the premises beyond the arrestee's body or area of reach."  *Katz v. Morgenthau*, 892 F.2d 20, 22-23 (2d Cir. 1989).[8]  Both the Complaint and Defendant Herz's report state that he seized the gun from the rear compartment of Minto's car, a minivan.  *See* [Dkt. #1, Compl. at ¶ 22; Dkt. #14-1, Defs.' Memo. of Law in Supp. of Mot. to Dismiss, at 33].  Nothing in the record suggests that this rear compartment was within Minto's area of reach, or in an "area from within which he might gain possession of [the] weapon."  *Arizona v. Gant*, 556 U.S. 332, 335, 339 (2009) ("If there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search . . . the [search-incident-to-arrest] rule

---

[8] While there are four exceptions to this rule, the facts offered at the present stage do not establish that any apply.  *See Katz*, 892 F.2d at 23 ("Exceptions to this rule include: (a) items that were in plain view at the time of the security check incident to the arrest . . . (b) items that were seized with the consent of the person lawfully in control of the property . . . (c) items that were seized under exigent circumstances."); *see also U.S. v. Proctor*, 489 F.3d 1348, 1353 (D.C. Cir. 2007) (discussing the "'community caretaking' exception" applicable to searches of impounded automobiles); *U.S. v. Coccia*, 446 F.3d 233, 238 (1st Cir. 2006) ("[T]he community caretaking function encompasses law enforcement's authority to remove vehicles that impede traffic or threaten public safety and convenience.").  With regard to the community caretaking exception, the Second Circuit has recognized "a split among the circuits" regarding the circumstances necessary to rely upon the doctrine, a question which it "has not yet addressed."  *U.S. v. Barrios*, 374 F. App'x 56, 57 (2d Cir. Mar. 9, 2010).  Given the uncertainty surrounding the scope of this exception and the significant amount of fact development remaining in this case, the parties should address the applicability of *each* of these exceptions in their summary judgment briefing, should either party make such a motion.

does not apply.").  Accordingly, Defendants' motion is DENIED as to Count II.

**C.**     **Count III of the Complaint is Barred by Sovereign Immunity**

In Count III, Minto brings claims under the Fourth and Fourteenth Amendments in connection with the post-arrest seizure of his pistol permit. *See* [Dkt. #1, Compl. at 11-13].  However, this claim must be dismissed. First, none of the named Individual Defendants are alleged to have been involved in the revocation of Minto's gun permit.  Minto contends that on May 30, 2012, the day after his arrest, the Special Licensing and Firearms Unit of the CSP revoked his gun permit based on the incident leading to his arrest.   [*Id.* at ¶¶ 49-50].  The author of this letter was CSP Detective Vincent Imbimbo, who is not a defendant in this action.  [*Id.* at ¶ 50].  The Complaint does not identify any other individuals in connection with this letter or decision.[9]

Second, Minto challenges the revocation on the ground that the offenses with which he was charged do not fall within the scope of the applicable sections of Connecticut law.  [*Id.* at ¶ 53].  Thus, Minto's claim does not contest the validity of his arrest or the charges that were brought against him.  Instead, the Complaint contends that the charges do not constitute "any of the crimes specifically indicated in the relevant statutes," and thus, "[t]he [CSP] revoked the Plaintiff's permit . . . without

---

[9] Minto does not challenge the May 9, 2013 appeal hearing, at which Defendant Hertz testified and resulted in the return of the permit and a finding that its seizure was without authority.  *See* [Dkt. #1, Compl. at ¶¶ 29, 49-55].  Nowhere does the Complaint allege Herz's involvement in the original decision to revoke the license.

cause and in violation of his Fourth Amendment[] protection against unlawful seizures."   [*Id.* at ¶¶ 53-54].[10]

Because Defendant CSP is the only named Defendant who is alleged to have participated in the initial decision and implemented the procedure revoking his gun permit, Count III must be DISMISSED.

**D.**   <u>Count IV of the Complaint Fails to State a Claim</u>

In Count IV, Minto brings an equal protection claim under the Fourteenth Amendment stemming from Defendant Herz's decision to arrest him, while declining to take any action against Gruszczak.   *See* [Dkt. #1, Compl. at 13-15].   In support of his claim, Minto asserts that Herz relied exclusively on Gruszczak's cross-complaint statement in deciding to arrest him, and that his account was "more credible" because he was "the initial complainant" who made three calls to 911 prior to the Defendants' arrival on the scene.   [Dkt. #1, Compl. at ¶¶ 59, 61-62].   The facts alleged, even if true, are insufficient to make out an equal protection claim.

"The Equal Protection clause of the Fourteenth Amendment guarantees 'a right to be free from invidious discrimination in statutory classifications and other governmental activity.'"   *Laupot v. City of New York*, No. 01 Civ. 3294, 2002 WL 83673, at *2 (S.D.N.Y. Jan. 18, 2002) (quoting *Harris v. McRae*, 488 U.S. 297, 322 (1980)).   "The Clause is

---

[10] Minto's claim also fails because, in addition to the enumerated factors, his gun permit could lawfully be revoked "upon a determination that he was not 'suitable' to hold a permit," based on his involvement in the incident.   *Kuck v. Danaher*, 822 F. Supp. 2d 109, 124-25 (D. Conn. 2011). Indeed, the relevant statute expressly provides that the Commissioner "may revoke [a] state permit . . . upon the request of any law enforcement agency."   Conn. Gen. Stat. § 29-32b(b).

'essentially a direction that all persons similarly situated should be treated alike.'" *Id.* (quoting *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985)).  Generally, to state an equal protection claim, the plaintiff must establish that he is a member of a protected class, such as persons of a particular race or gender.  *Id.*  However, "the equal protection guarantee also extends to individuals who allege no specific class membership but are nonetheless subject to invidious discrimination at the hands of government officials."  *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001).  Thus, under certain circumstances, a plaintiff who does not allege membership in a protected class may state a claim for an equal protection violation as a "class of one."  *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564-65 (2000).  To state such a claim, a plaintiff must allege "that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Id.* at 564.  "[C]lass-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves."  *Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010) (quoting *Clubside, Inc. v. Valentin,* 468 F.3d 144, 159 (2d Cir. 2006)) (affirming dismissal of equal protection claim based on plaintiffs' contention that defendant refused to consider their application while considering applications submitted by those similarly situated where complaint failed to allege facts showing that the accepted applications "were made by persons similarly situated").

> Accordingly, to succeed on a class-of-one claim, a plaintiff
> must establish that (i) no rational person could regard the

circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake.

*Id.* at 59-60 (quoting *Clubside, Inc.*, 468 F.3d at 159).

Also, in the equal protection context, "[c]ourts have consistently expressed an unwillingness to intrude upon a police officer's discretion to decide when to effectuate an arrest." *Fedor v. Kudrak*, 421 F. Supp. 2d 473, 481 (D. Conn. 2008) (citing cases); *see also Brisbane v. Milano*, No. 3:08-cv-1328 (VLB), 2010 WL 3000975, at *5 (D. Conn. Sept. 26, 2011) (rejecting race-based equal protection claim predicated on police decision to investigate plaintiffs while declining to investigate others).

As an initial matter, Minto has not alleged that he is a member of any protected class. *See* [Dkt. #1. Compl. at 13-15]. Accordingly, the Court assumes his equal protection claim is based on a "class of one" theory. *Gavlak v. Town of Somers*, 267 F. Supp. 2d 214, 224 (D. Conn. 2003). Turning to the allegations in the Complaint, Minto entirely fails to allege that he and Gruszczak are similarly situated. Indeed, much of the Complaint is aimed at distinguishing his conduct from hers. Other than that they were both motorists who were interviewed by the police, their similarities appear to end there. Relatedly, the conduct each is alleged to have undertaken differs dramatically, such that there was an eminently rational reason for the disparate treatment. *Minto* was the one who passed Gruszczak on the right while driving, took evasive braking measures, followed Gruszczak from the main road all the way to her home, got out of

his vehicle in uniform and badge, and raised the possibility of her arrest. [Dkt. #1, Compl. at ¶¶ 10-11, 13-15; Dkt. #14-1, Defs.' Memo. of Law in Supp. of Mot. to Dismiss, at 33].[11]   Given these facts, and the absence from the Complaint of any allegation "that the failure to arrest [Gruszczak] was based upon any improper or discriminatory reason," Minto's equal protection claim must fail.  *Jenkins v. Talika Rice & Progressive Ins. Co.*, No. 5:11-cv-1037 (LEK/ATB), 2011 WL 4809987, at *2 n. 1 (N.D.N.Y. Jul. 27, 2010) (Report & Recommendation), *adopted in part and rejected in part on other grounds by* 2011 WL 4810978 (N.D.N.Y. Oct. 11, 2011).

E.   Count V Fails to State an Equal Protection Claim But Does Plead Facts Sufficient to Allege a Procedural Due Process Claim

For the same reasons as the previous count, Count V, which asserts an equal protection claim based on the revocation of Minto's police identification card and fails to identify *any* similarly situated individuals or to allege disparate treatment relative to such individuals fails as a matter of law.

However, the Court notes that the allegations underlying this claim appear to state a procedural due process claim, as Minto recognized in his Opposition.  [Dkt. #21, Pl.'s Opp. at 15-16].  The Complaint alleges that, on May 30, 2012, the day after the incident, Defendant Bruso sent Minto a letter stating that the card was "revoked effective immediately."  [Dkt. #1, Compl.

---

[11] For this reason, regardless of whether the Court treats Minto's equal protection claim as a "class of one" claim or a claim for selective enforcement, as Minto advances in his Opposition, the claim still fails. *See Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000) (to prevail on a claim for selective enforcement a plaintiff must prove that "the [plaintiff], compared with others similarly situated, was selectively treated").

at ¶¶ 27, 64-65].  The Complaint clearly indicates that this letter informing Minto of the revocation was the first notice he received regarding the decision.  In addition, Plaintiff contends that he was not "provide[d] a due process hearing" prior to the revocation, and the revocation of his police powers directly caused his employer, CVH, to put him on unpaid leave "immediately following the incident, and [he] has remained on unpaid leave since that time."  [*Id*. at ¶ 28].  When Minto's attorney requested an explanation of the "basis for the revocation" and requested the procedure to appeal the decision, Defendant Bruso failed to offer a basis and informed him that there was no appeals process.  [*Id*. at ¶¶ 68-69].

Given that Minto was afforded neither pre-deprivation notice nor a hearing, no explanation for the basis of the decision, no opportunity to appeal it, and, as a result of the revocation, Minto was put on unpaid leave, the Complaint appears to state facts sufficient to plead a procedural due process violation.  *See Fusco v. Motto*, 649 F. Supp. 1486, 1488-91 (D. Conn. 1986) (finding plaintiff had both a liberty and property interest in his appointment as a special policeman and granting summary judgment on plaintiff's procedural due process claim where plaintiff's police powers were revoked without notice and a hearing).  Accordingly, Count V of the Complaint remains as a procedural due process claim and Defendants' motion is DENIED.

F.     Count VI is Barred by Sovereign Immunity

For reasons already stated, Count VI, which brings claims under 42 U.S.C. §§ 1981 and 1983 solely against Defendant CSP, must be DISMISSED

on sovereign immunity grounds.  *See Coger v. Connecticut*, 309 F. Supp. 2d 274, 281 (D. Conn. 2004) ("[W]hen a person's rights protected by § 1981 are violated by a state actor (as opposed to a private person) the aggrieved party has a cause of action pursuant to 42 U.S.C. § 1983 and not 42 U.S.C. § 1981.") (noting that "even if the plaintiff had pled a cause of action pursuant to 42 U.S.C. § 1983 [against the State of Connecticut Department of Public Safety and Department of Administrative Services], his claim would nonetheless be barred by the Eleventh Amendment").

While Plaintiff mentions "state officials" in his Opposition, the only defendant the Complaint references in connection with this count is Defendant CSP.  *See* [Dkt. #1, Compl. at ¶ 76 ("Such conduct and/or policies on the part of the defendant, CSP, constituted a continued, and continuing, moving force behind the violation of the civil rights of the plaintiff and the injuries he has suffered.").  This count also fails because it does not specify the constitutional "rights" Minto claims he was denied by the Defendants' conduct, nor does it identify the provision of the Constitution pursuant to which it is brought.  Accordingly, Count VI of the Complaint is DISMISSED.

### G.   Count VII States a Claim for Intentional Infliction of Emotional Distress as to Defendant Herz

Finally, in Count VII, the Complaint brings a claim for intentional infliction of emotional distress against Defendants Herz, Tomassetti, and Kostrzewa.  *See* [Dkt. #1 Compl. at 18-19].

To state a claim for intentional infliction, Minto must allege facts sufficient to show: "(1) that the actor intended to inflict emotional distress

or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Appleton v. Board of Educ. of Town of Stonington*, 254 Conn. 205, 210, 757 A.2d 1059, 1062 (Conn. 2000) (citations and quotations omitted). To be extreme or outrageous, the conduct must "exceed[] *all bounds* usually tolerated by decent society." *Petyan v. Ellis*, 200 Conn. 243, 254, 510 A.2d 1337, 1342 n. 5 (Conn. 1986) (emphasis in original) (citations and quotations omitted). "Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient . . . ." *Appleton*, 254 Conn. at 210, 757 A.2d at 1062 (citations and quotations omitted). "Such conduct may, however, give rise to a cause of action where the defendant is aware of the peculiar sensitivities of the plaintiff." *Brown v. Ellis*, 40 Conn. Supp. 165, 167, 484 A.2d 944, 946 (Conn. Super. Ct. 1984). ("The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reasons of some physical or mental condition or peculiarity. The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know.") (quoting 1 Restatement (Second), Torts § 46); *see also Calderon v. Dinan & Dinan PC*, No. 3:05-cv-1341 (JBA), 2006 WL 16146157, at *10 (D. Conn. Jun. 13, 2006) ("In some cases, allegations that the defendant knowingly exploited a particular susceptibility of the plaintiff

have survived dismissal.").  "Under Connecticut law, it is for the court to make an initial determination of whether the alleged misconduct meets the threshold requirements of outrageousness."  *Brown v. Ne. Nuclear Energy Co.*, 118 F. Supp. 2d 217, 223 (D. Conn. 2000) (citing *Appleton*, 254 Conn. at 210. 757 A.2d at 1062)).

As to Defendants Tomassetti and Kostrzewa, the allegations in the Complaint do not rise to the level of extreme or outrageous conduct sufficient to make out a claim for intentional infliction.  In essence, Minto contends that each Defendant played a role in deciding whether to arrest him based on the information contained in Herz's report.  See [Dkt. #1, Compl. at ¶¶ 23-26].  As the Court has concluded that there was sufficient probable cause contained in the report to support Minto's arrest, *see supra* at 9-14, their decision to rely on the report was reasonable and does not come close to meeting the extreme and outrageous standard.

On the other hand, construed in a light most favorable to Minto, the allegations against Defendant Herz, which include his (i) decision to contact Minto's employer and direct his supervisor to appear at the scene of the incident, (ii) informing Minto's supervisor of the weapon he found in Minto's car, which he knew or should have known from his discussion with Minto violated Minto's employer's weapons policy, (iii) drafting the incident report which served as the basis for the revocation of Minto's gun and special police permits and suspension from his job, and (iv) his decision to testify against Minto at the appeal hearing in connection with the revocation of his pistol permit could collectively be viewed as conduct

27

sufficient to support a finding of intentional infliction of emotional distress. Accordingly, Count VII is DISMISSED as to Defendants Tomassetti and Kostrzewa and Defendants' motion is DENIED as to Defendant Herz.

## IV.    <u>Conclusion</u>

For the foregoing reasons, the Court GRANTS Defendants' Motion to Dismiss Counts I, III, IV, and VI, DISMISSES all counts against Defendant CSP and the Individual Defendants in their official capacities, and DENIES Defendants' Motion as to Counts II, V, and VII.  The case will proceed as to Count II, Count V, but only as a procedural due process claim, and Count VII, but only with respect to Defendant Herz.

IT IS SO ORDERED, ADJUDGED AND DECREED, this 30TH day of September 2015, Hartford, Connecticut

_____/s/_____
Vanessa L. Bryant,
United States District Judge

28